**This order is SIGNED.**



**Dated: May 27, 2016**



**WILLIAM T. THURMAN**
**U.S. Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| In re: | Bankruptcy No.: 14-20290 |
| **DONALD JOSEPH LARKIN** | Chapter 7 |
| Debtor(s). | |
| | Honorable William T. Thurman |
| **TELEGRAPH TOWER, LLC, et al.,** | |
| Plaintiffs, | |
| vs. | Adversary Proceeding No. 14-02103 |
| **DONALD JOSEPH LARKIN, et al.,** | |
| Defendants. | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came on regularly before the Court for trial on February 4 and 5; March 3

and 4; and May 6, 2016, the Honorable William T. Thurman, United States Bankruptcy Judge,

presiding. Plaintiffs Telegraph Tower, LLC, and Jared Christiansen were represented by Bryce

D. Panzer of Blackburn & Stoll, LC. Defendants Donald Larkin and Stephen Larkin represented

themselves pro se. The Court made pretrial rulings on the record in open court and admitted

certain exhibits, which are incorporated herein by this reference. The Court also takes judicial

notice of the docket in this adversary proceeding and in the underlying chapter 7 case.

The Court has heard and considered the testimony of witnesses and has also considered

the documents admitted into evidence. The Court now issues its Findings of Fact and

Conclusions of Law.[1]

## I.    JURISDICTION, VENUE AND NOTICE

Federal subject-matter jurisdiction is founded on 28 U.S.C. § 1334. This matter is a core

proceeding that a bankruptcy judge may hear and determine.[2] To the extent it may ever be

determined to be a matter that a bankruptcy judge may not hear and determine without consent,

the parties nevertheless consent to such determination by a bankruptcy judge.[3] Venue is proper

under 28 U.S.C. § 1409. Notice of this trial was adequate and proper in all respects.

## II.   FINDINGS OF FACT

1.      Stephen Larkin ("Stephen") filed a Chapter 7 bankruptcy petition in the District of

Utah on January 8, 2014, as Case No. 14-20198.

2.      Donald Larkin ("Donald" and together with Stephen, the "Larkins") filed a Chapter 7

bankruptcy petition in the District of Utah on January 10, 2014, as Case No. 14-20290.

---

[1] These findings of fact and conclusions of law shall constitute findings of fact and
conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any
finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice
versa.

[2] *See* 28 U.S.C. §§ 157(b)(2)(A), (I), and (J).

[3] *See* 28 U.S.C. § 157(c)(2).

3.      On March 28, 2014, Telegraph Tower, LLC, a Nevada limited liability company ("Telegraph") and Jared Christiansen ("Christiansen" and together with Telegraph, "Plaintiffs") filed two separate adversary proceedings, one in each of the Larkins' separate bankruptcies. Counsel for Telegraph and the Larkins stipulated to a consolidation of the two adversary proceedings.[4]

4.      On April 8, 2014, Plaintiffs and L. Warren Cox and Trina Kay Cox, Trustees of the L. Warren Cox Living Trust dated August 8, 1997 (the "Coxes") filed two separate adversary proceedings, one in each of the Larkins separate bankruptcies.

5.      The various aforementioned adversary proceedings were subsequently consolidated by order of this Court for all further proceedings and for trial.[5]

6.      The claims asserted by the Coxes were subsequently assigned to Christiansen, and the Court entered an order substituting Christiansen for the Coxes as the real party in interest with respect to such claims.[6]

**Century Mortgage**

7.      Century Mortgage ("Century"), a Utah limited liability company, was formed in 2006. Century was the successor to an entity called Century Investments, Inc., which was formed by Donald in 1986. Donald is an 80% member of Century and Stephen is a 20% member of Century.

---

[4] Adv. Pro. No. 14-2103, Docket No. 9, Stipulated Order Consolidating Cases. All future references to the Docket will be to Adversary Proceeding No. 14-2103 unless otherwise specified.

[5] Docket No. 33, Order Granting Motion To Consolidate Lead Case: 14-02103 Member Cases: 14-02122.

[6] Docket No. 61, Order Granting Motion for Leave to Substitute Parties.

8.      Century was in the business of arranging loans to persons and entities that wished to borrow funds.

9.      Generally, all loans arranged by Century were short-term construction loans extended to developers and builders for the financing and construction of residences and, to a lesser degree, commercial properties. The lending activities were primarily in Washington County, Utah, and surrounding counties.

10.     Funds for many of the loans arranged by Century were provided by persons and entities that wished to participate in such loans. These persons and entities are commonly referred to as Investors or Lenders ("Investors").[7]

11.     Century would gather information from prospective borrowers, analyze loan proposals from prospective borrowers, receive funds from Investors, then document and close the loans.

12.     In exchange for its services, Century would receive fees, typically in the nature of origination fees paid by borrowers from loan proceeds.

13.     Century frequently pooled funds belonging to Investors. For example, Century would receive and hold funds provided to Century by Investors for the purpose of funding advances on loans. Century would also hold funds of Investors on loans that had been paid off by borrowers per agreement with an Investor ("Investor Agreement"). This situation typically arose if Investors and Century anticipated that the funds would be redistributed to fund new loans or if Investors agreed to participate in new loans with the funds.

---

[7] In the first sentence of the Construction Loan Agreement (Pltf. Ex. 9) Investors are referred to as "investors." Thereafter Investors are referred to as "lenders." The term "lenders" is often used interchangeably when referring either to Investors or to Century.

4

14.     Funds held by Century on behalf of Investors were generally held in the same bank account as other funds belonging to Century and funds belonging to other Investors. During the relevant times hereto, Century used a single bank account, at SunFirst Bank, to hold its own funds and the funds belonging to Investors (the "SunFirst Bank Account"). The SunFirst Bank Account was used by Century for payment of Century's general operating expenses and payroll, disbursements of loan proceeds, and collection of payments on loans from borrowers. Century used QuickBooks, an accounting software program, for all accounting for the SunFirst Bank Account.

**Telegraph Tower Project**

15.     Around 2008, Christiansen formed Telegraph for the purpose of developing a parcel of property then owned by Christiansen, which was located at 82 East Telegraph Road, Washington City, Utah (the "Property"). Bradly S. Harrell ("Harrell") was also a member of Telegraph.[8]

16.     Christiansen had a loan with Village Bank, which was secured by a first priority trust deed on the Property.

17.     Plaintiffs intended to develop the Property as a mixed-use retail and office building having a gross building area of approximately 32,000 square feet (the "Project").

18.     Beginning around 2008 and continuing on during the relevant times herein, the parties acknowledged that the United States economy saw a sharp decline generally referred to as the Great Recession. The Great Recession had a negative impact on real-estate values nationwide, including Utah. Borrowing and lending patterns began to change, defaults on real

---

[8] Harrell was a member of Telegraph and participated in certain transactions and dealings with Century and the Larkins, along with Plaintiffs, at all relevant times herein. Harrell is not a party in this proceeding but testified regarding the events surrounding the Project Loan.

estate loans became more frequent, and obtaining funding for real estate projects was extremely difficult. As a result, Plaintiffs requested but failed to obtain financing from several banks and lending institutions. Century became a lender of last resort to Plaintiffs.

19.     In approximately the fall of 2008, Plaintiffs contacted Century in connection with their efforts to obtain construction financing for the Project (the "Project Loan"). Plaintiffs and Harrell provided Century with financial statements to support the Project Loan.  Plaintiffs also provided Century with pertinent information relating to the Project, including descriptions of the Project and third-party appraisals of the Project.

20.     Century expressed an interest in participating in and obtaining construction funding for the Project Loan through its group of Investors. The parties later agreed that the Project Loan would be approximately $2.8 million, which was calculated sufficient to pay off the underlying loan held by Village Bank and provide for completing construction on the Project.

**Plaintiffs' Claims**

21.     During the times relevant to this matter, approximately 2006-2012, the Larkins participated in decisions on behalf of Century and in its business activities, and were persons in control of Century's business. Brian Larkin ("Brian"), an employee of Century and the son of Stephen, also heavily participated in the business activities and preparation of the Project Loan but was not in a pivotal decision making role.

22.     During the times relevant to this matter, the Larkins had knowledge of the financial status of Century, including the assets of Century, funds on deposit in the SunFirst Bank Account, and Century's disbursements of funds from the SunFirst Bank Account. This knowledge included knowledge of the various receipts and disbursements otherwise identified and described in these Findings of Fact.

23.    The basis of Century's business model was that Century would act as the agent for Investors in gathering information from prospective borrowers, analyzing loan proposals, receiving and holding funds from Investors for the loans, documenting and closing the loans, and servicing the loans on behalf of Investors. Century's business model also included the practice of not earmarking Investor funds for a specific loan in the SunFirst Bank Account. Investor funds were accounted for in Century's QuickBooks records, but Century would use Investor funds at its discretion to pay administrative expenses, repayments to Investors, and payments on loans and other projects.

24.    Typically, Century was not itself a lender, unless it participated as such with respect to a specific loan.

25.    Century's servicing of the loans included gathering funds from Investors, holding and disbursing the funds on behalf of Investors pursuant to the loan documents (typically as construction loan draws), collecting payments on the loans and, if necessary, arranging for foreclosure and sale of collateral.

26.    Century's typical business practices were followed with respect to the Project Loan. In particular, Century acted as the agent for the various Investors that agreed to participate in the Project Loan, and, as such, owed fiduciary duties to those Investors. [9]

27.    As the members and persons in control of Century, the Larkins also owed fiduciary duties to Investors with respect to the Project Loan and admit to this fact. [10]

_____

[9] The Investor Agreement stated "Century Mortgage agrees to act as agent for the above investors in gathering pertinent information about the property and principals involved and making such information available to the investors, along with a recommendation." (Pltf. Ex. 25). The Construction Loan Agreement stated "[t]his agreement . . . by and between . . . Telegraph Tower, Jared Christiansen and Bradley Harrell individually . . . and Century Mortgage, as agent for investors." (Pltf. Ex. 9).

28.    The Larkins contacted various persons and obtained commitments that certain persons would be willing to participate as Investors in the Project Loan.

29.    In approximately late March and/or early April 2009, the Larkins advised Plaintiffs that Century was close to obtaining sufficient commitments from its Investors in order to fund the Project Loan. Specifically, the Larkins advised Plaintiffs that certain loans extended by Investors on other projects were maturing and would be paid off to Century, and a loan on another property (commonly referred to as "Entrada Lot 12"), was being paid to Century, thereby generating over $1 million, which was a significant portion of the funds needed for the Project Loan.

30.    The Larkins advised Plaintiffs that many of Investors involved in Entrada Lot 12 were willing to commit their funds to the Project Loan. The Larkins further advised Plaintiffs that Century would need about six more weeks to obtain the remaining funds for the Project Loan.

31.    The Larkins informed Plaintiffs that in order to maintain the commitments to Century from Investors on the Project Loan, Investors needed to be assured that they would receive interest on their funds. The interest would be held by Century for the benefit of Investors until Century had obtained sufficient additional commitments to close the Project Loan.

32.    The Larkins participated in and knew that communications regarding interest payments pending loan closing were being made to Plaintiffs.

33.    Based upon Century's specific assurances that the necessary remaining commitments for the Project Loan could be obtained in approximately six weeks, which would trigger the

---

[10] During trial, when asked whether Century and/or the Larkins owed a fiduciary duty to Investors, Donald Larkin testified that he had "no separation in mind about Century and [the] Larkin[s] so [the] Larkin[s] as principal [to Century] also owed a fiduciary duty to Investors."

Project Loan closing, Plaintiffs agreed to pay interest on funds committed by Investors to the Project Loan.

34.     The sale of Entrada Lot 12 in fact closed in late March 2009, and, as a consequence thereof, Century received $1,153,023.48 belonging to Investors involved in the Entrada Lot 12 loan. These funds were deposited in the SunFirst Bank Account.[11]

35.     Donald represented to Plaintiffs that a substantial portion, over $1 million, of the Entrada Lot 12 funds would be committed to the Project Loan.

36.     Within one month after Century received the funds from the sale of Entrada Lot 12, Century applied a substantial portions of those funds in payment of obligations of Century. Century made the following payments:

A.     $503,197.29 to SunFirst Bank on a credit line loan of Century, which was guaranteed by Donald, Stephen, the Larkin Family Limited Partnership, and the Larkin Family Charitable Trust[12];

B.     $50,152.64 on an obligation of Donald to U.S. Bank, which Donald previously put into Century in some form; and

C.     $153,650 to Professional Interchange Properties, LLC, on an obligation of Century and/or Donald, which Donald previously put into Century in some form.

37.     Although consistent with Century's business model, as a consequence of the above referenced disbursements and various other disbursements by Century, as well as payments to

---

[11] Pltf. Ex. 28.

[12] SunFirst Bank pulled back the credit line loan to Century which caused Century to make the payment of $503,197.29 to SunFirst Bank.

Investors on other loans collected, as of April 20, 2009, Century only had about $15,000.00 left on deposit in the SunFirst Bank Account.[13]

38.     By April 20, 2009, Century had exhausted essentially all of the funds it had represented to Plaintiffs as had been received to fund the Project Loan, which Plaintiffs had agreed to pay interest, pending loan closing. This information was not disclosed to Plaintiffs and Century delayed closing of the Project Loan for approximately another year.

39.     Century and the Larkins did not inform Plaintiffs that almost all of the funds collected to fund the Project Loan had been used by Century for other purposes. The Larkins led Plaintiffs to believe that the Project Loan funds continued to be held by Century.

40.     Had Plaintiffs been told that the funds collected by Century were used for other purposes Plaintiffs would have terminated their efforts to close the Project Loan with Century because it would have been apparent that Century and Investors did not have the ability to fund and complete the Project Loan.

41.     At various times after April 20, 2009, Century collected and retained "rollover funds" (i.e., funds belonging to investors on account of payoffs of other loans in which such investors recommitted the funds to new loans). Century advised Plaintiffs that the "rollover funds" would be used to fund the Project Loan.

42.     At various times thereafter, until approximately late April 2010, Century collected "new money" (i.e., cash deposits that were not payoffs on existing loans being serviced by Century), from prospective Investors. Century advised Plaintiffs that the "new money" would be used to fund the Project Loan. For example, Century collected "new money" from the following:

---

[13] Pltf. Ex. 28.

A.      $200,000 from Craig Hopkinson, Trustee of CTTZ on or about June 19, 2009;

B.      $600,000 from Harris Property Investment on or about September 28, 2009, November 17 and 18, 2009, and April 30, 2010; and

C.      $100,000 from Dustin Gillman on or about November 20, 2009.

43.     The "rollover funds" and the "new money" (the "Future Receivables") were deposited in Century's SunFirst Bank Account.

44.     Through late April 2010, Century had collected approximately $2.5 million from Investors and these funds were committed to the Project Loan.

45.     Consistent with Century's business model, Century continued to use funds in the SunFirst Bank Account to pay its general operating expenses and payroll, for disbursement of other loans that it was servicing for Investors.

46.     Throughout the period from April 2009 until late April 2010, the difference between the funds collected by Century for funding the Project Loan and the funds actually available in the SunFirst Bank Account continued to grow.

47.     During this same period, Century used, for its own purposes, approximately $1.8 million from the funds that were committed by Investors to the Project Loan.

48.     Throughout the same period, the Larkins were aware of the funds Investors committed to the Project Loan and were also aware of the funds actually available in the SunFirst Bank Account.

49.     Throughout the same period, the Larkins continued to advise Plaintiffs that the Project Loan funds were available. The Larkins did not tell Plaintiffs that Century had spent or disbursed the majority of the Project Loan's funds for other purposes.[14]

50.     Despite having collected over $2.5 million from Investors for the Project Loan, as of late April 2010, Century had only approximately $600,000 in the SunFirst Bank Account and almost all of the funds were Future Receivables, recently collected from Investors to fund the Project Loan.

51.     As of late April 2010, the Larkins informed Plaintiffs that Century had sufficient funds to close the Project Loan, excepting only about $300,000. Particularly, the Larkins informed Plaintiffs that Century possessed sufficient funding needed to fund the draws to be paid during the construction period. At that point, the Larkins advised Plaintiffs that Century was prepared to close on the Project Loan.

52.     From the Larkins point of view, telling Plaintiffs that Century had the funds for the Project was truthful because Century and the Larkins were counting on Future Receivables and anticipated collections. However, under the circumstances of the Project Loan, Plaintiffs knew Century had solicited and collected funds specifically for the Project and it was reasonable for Plaintiffs to believe the Project Loan funds would be held and sequestered only for the Project.

53.     The Larkins participated in and knew of these communications with Plaintiffs.

---

[14] It was customary for the Larkins not to advise investors or borrowers of the funds it had on hand. If an investor or borrower inquired about the status of funds, the Larkins testified that they would have disclosed such information. In this case, Investors and Plaintiffs did not request an accounting of funds for the Project Loan before closing the Project Loan. Rather, Plaintiffs relied on the Larkins reputation and continuous assurances that sufficient funds were available to close the Project Loan.

54.     Because Century had spent the Project Loan funds for other purposes, Century only had approximately $600,000 in the SunFirst Bank Account, which was at least $1.8 million less than was represented to Plaintiffs as being available.[15]

55.     Despite only having $600,000 of the $2.8 million required for the Project Loan, the Larkins assumed Century would have funds available, from Future Receivables and anticipated collections, to fund construction draws requested by Plaintiffs for the Project Loan. Century's seemingly infallible business practice proved to be precarious and reckless during the Great Recession.[16]

56.     The Larkins had a duty to advise Plaintiffs of material information regarding the Project Loan. The Larkins did not advise Plaintiffs that Century only had $600,000 of the $2.8

---

[15] As of April 2010, the Larkins represented to Plaintiffs that Century had $2.5 million available for the Project Loan. The Larkins represented to Plaintiffs that Century only needed $300,000 to close Project Loan, which required $2.8 million. As of April 2010, Century only had $600,000 in the SunFirst Bank Account, which was $1.8 million less than was represented to Plaintiffs. (Pltf. Ex. 28 shows Century had $430,308.72 in the SunFirst Bank Account as of April 20, 2010 but Plaintiffs and Century testified that the SunFirst Bank Account had approximately $600,000 at the end of April 2010.) The Larkins represented to Plaintiffs that Century only needed approximately $300,000 to close the Project Loan.

[16] The Court uses the term "reckless" as it is used in legal treatises and case law for 11 U.S.C. § 523(a)(2)(A) purposes. Under the circumstances, including the fact that Plaintiffs knew Century had raised over $2.8 million dollars from Investors for the Project, and that the Great Recession was raging across the United States, the Larkins should have been more careful in their business practice and changed their business model. As an example of the Larkins' recklessness, Century expected $750,000 from Joseph Venuti ("Venuti") to fund the Project Loan. Century did not secure the debt owed by Venuti. Venuti filed a Chapter 7 bankruptcy on July 22, 2009, Venuti's bankruptcy case converted to a Chapter 11 on October 21, 2009, and then reconverted to a Chapter 7 on November 17, 2010 . Venuti listed the debt owed to Century as an unsecured claim. The Larkins were aware of the filing but still expected the $750,000 from Venuti to be available to fund the Project Loan, which did not close until May 2010. The Larkins were reckless in believing Venuti would pay Century on this unsecured obligation under the circumstances.

13

million required for the Project Loan. Plaintiffs reasonably believed, based on Century's and the
Larkins' representations, that the full amount necessary for the Project Loan had not only been
collected by Century but were segregated into a disbursement account awaiting construction
draw requests from Plaintiffs.

57.    The failure of the Larkins to advise Plaintiffs that the Project Loan funds were not
available in the SunFirst Bank Account was irresponsible under the existing circumstances. The
Larkins carelessly anticipated that Century would accumulate Future Receivables and anticipated
collections for the Project Loan but did not communicate this plan to Plaintiffs. Accordingly, the
Larkins should have communicated this plan to Plaintiffs particularly in light of the Great
Recession.

58.    Plaintiffs were not aware that the Project Loan funds were not readily available.
Moreover, Plaintiffs were not aware that the representations made by the Larkins were reckless
and based on a plan of pure hope.

59.    The Larkins recklessly disregarded the truth for the purpose of inducing Plaintiffs to
rely on such representations in continuing to deal with Century with respect to closing the
Project Loan. Plaintiffs justifiably relied on such representations to their detriment.

60.    It was necessary for Century and the Larkins to induce Plaintiffs to close on the
Project Loan because if Plaintiffs did not close on the Project Loan, Century would have been
required to return the funds to Investors, and it no longer had sufficient funds to do so.

61.    In addition, Christiansen's secured loan with Village Bank had matured. If Village
Bank foreclosed on the Property, Century would likewise be unable to close on the Project loan,

14

and would have been required to return the funds to Investors.[17] Having spent the funds, Century

no longer had the ability to return the funds to Investors. Accordingly, the Larkins' reckless

disregard for the truth and conduct were motivated by a desire to continue to conceal Century's

prior use of the funds for the Project Loan.

62.    Had Plaintiffs known that the Larkins recklessly disregarded the truth by failing to

disclose Century's entire financial picture and Century's reliance on Future Receivables,

Plaintiffs would not have closed on the Project Loan. Among other things, had the Larkins

informed Plaintiffs that the $2.8 million required for the Project Loan was used for other

purposes and not readily available, Plaintiffs would have realized that Century would be unable,

or likely unable, to fund the necessary construction draws for the Project Loan.

63.    Lacking knowledge of the Larkins' reckless disregard for the truth, Plaintiffs

proceeded to close the Project Loan, with Century acting as agent for Investors.

64.    Plaintiffs and Harrell, as borrowers, Century, as agent for Investors, and Investors, as

lenders, executed various documents to evidence the Project Loan (the "Project Loan

Documents"). The Project Loan Documents included a Trust Deed Note,[18] Construction Loan

Agreement,[19] Trust Deed on the Property,[20] a construction budget,[21] and closing or settlement

statements.[22]

---

[17] As a commitment to funding the Project Loan, on May 21, 2009, Century sent Village
Bank a letter of intent to pay off the loan to Village Bank. In May 2009, Village Bank was in the
process of foreclosing on the Property. To stop foreclosure, Century made several pay-off
proposals while distributing funds to Village Bank. Century's payments to Village Bank
benefited all parties in connection with the Project Loan. (Pltf. Exs. 34-38).

[18] Pltf. Ex. 4. The Trust Deed Note and Trust Deed reflect that Investors were the payees
and beneficiaries respectively.

[19] Pltf. Ex. 9.

65.     As reflected in the Construction Loan Agreement and construction budget, Century, as agent for Investors, agreed to make available to Telegraph the sum of $1,721,273.90 to pay costs of construction.[23] Century also represented that it held and would disburse from the Project Loan proceeds:

A.     An interest reserve of $338,520.00, which Century was to use to pay interest to Investors during the twelve months following the Project Loan closing; and

B.     A closing/origination fee to Century, which was agreed to be $108,285.00.

66.     After the Project Loan closed, Plaintiffs commences construction of the Project based upon Century's and the Larkins' representations that Century had and would have sufficient funds to fund the Project Loan in accordance with the Project Loan Documents.

67.     After commencing construction, Telegraph submitted two construction draw requests to Century,[24] to be paid in accordance with the Project Loan Documents. Century delayed disbursements on the construction draw requests, but eventually paid the requests in full.

---

[20] Pltf. Ex. 6.

[21] Plts. Ex. 11.

[22] Plts. Ex. 7.

[23] The Project Loan amount was $2,821,00.00 and after payoff of the Village Bank Loan and other costs, $1,721,273.90 was to be available for disbursement per the May 25, 2010 Construction Loan Agreement and signed construction budget.

[24] Telegraph submitted the construction draw requests on behalf of its general contractor, DMC Utah. (Pltf. Exs. 13 and 15).

68.      In August 2010, about two months into the construction of the Project, and after the submission of Telegraph's third draw request, Century and the Larkins informed Plaintiffs that Century did not have sufficient funds to continue disbursements on the Project Loan.[25]

69.      At this point, Century ceased making disbursements on the Project Loan on behalf of Investors.

70.      Century also ceased disbursement of the monthly interest payments to Investors from the interest reserve.

71.      The Larkins and Plaintiffs attempted to negotiate other arrangements for funding the Project Loan but were unsuccessful.[26]

---

[25] Around this time, in various correspondence, the Larkins stated:

(1) "Due to circumstances beyond our control we are experiencing a cash flow shortage," (Pltf. Ex. 39);

(2) "It is entirely our fault and none of yours. This is something new to us and we didn't do it correctly," (Pltf. Ex. 21);

(3) "The unplanned [events] have taken a toll on our free cash," (Pltf.Ex. 39); and

(4) "Let's just say we tried something and it didn't work out as planned" (Pltf. Ex. 22).

[26] In September 2010, Telegraph and Christiansen brought suit against Century Mortgage, Donald Larkin, Stephen Larkin, and various Investors in the Fifth District Court of Washington County (the "State Court"). Harrell and Brian Larkin were as parties to the suit. In January 2014, the actions against the Larkins were stayed due to their chapter 7 bankruptcy filings. (In March of 2015, Telegraph Tower and Jared Christiansen filed separate chapter 11 bankruptcy cases.) Certain Investors filed counter-motions against Telegraph, Christiansen, and Harrell. After discovery closed between October 2012 and February 2013, the parties made various motions and counter-motions for summary judgment. The State Court granted summary judgment in favor of Investors regarding the Investor's liability under the Construction Loan Agreement to continue to fund the loan to Telegraph. In addition, the State Court dismissed all claims against Investors and awarded Investors attorney fees against Telegraph and Christiansen. Telegraph and Christiansen appealed the decision and judgment to the Utah Court of Appeals. At a status conference held after conclusion of this trial in Telegraph's chapter 11 case (Case No. 15-22065), the attorney for Plaintiffs disclosed the status of the Litigation. These events occurred post-trial and this Court elects not to makes the post-trial status of the Litigation a finding with respect to this matter.

**L. Warren Cox and Trina Kay Cox, Trustees of the L. Warren Cox Living Trust dated**

**August 8, 1997 (the "Coxes") Claims**

72.     In early 2010, Warren Cox (Christiansen's former father-in-law) became aware,

through his daughter that Century was close to obtaining sufficient commitments to proceed with

the Project Loan.

73.     Mr. Cox contacted the Larkins and informed them that he had two lots in Iron

County, Utah that he was willing to pledge as collateral, as an Investor in the Project Loan, if

that would enable Century to complete the funding for the Project Loan.

74.     The Larkins informed Mr. Cox that Century had another Investor, Sam Schmutz, who

would be willing to put up $100,000 in cash if Mr. Cox would pledge the Iron County lots as

collateral.

75.     Accordingly, Mr. Cox, through a company he owned called CCC Construction,

executed a trust deed against the Iron County lots to secure the loan from Sam Schmutz. Mr. Cox

signed an Investor Agreement to participate in the Project Loan in the sum of $100,000.[27]

76.     In connection therewith, Century executed a trust deed note for $100,000, payable to

Mr. Schmutz.[28] Century gave a copy of the trust deed note to Mr. Cox.

77.     Notwithstanding this transaction, Century did not close and fund the Project loan.

78.     After execution of the Investor Agreement, the Larkins told Mr. Cox that Century still

needed cash to close the Project Loan. Mr. Cox told the Larkins that he was closing on the Iron

County lot which would generate approximately $100,000 and he was willing to invest that

---

[27] Pltf. Ex. 43.

[28] Pltf. Ex. 44.

amount in the Project Loan, if it was the last investment Century needed to close on the Project

Loan.

79.     The Larkins confirmed to Mr. Cox that $100,000 from his lot sale would be the last

funding and commitment Century needed to close the Project Loan.

80.     The Larkins agreed to the terms of Mr. Cox's proposal to provide $100,000 toward

the Project Loan only if it was the last funding needed to close the Project Loan. The Larkins

knew of and confirmed Mr. Cox's understanding that Mr. Cox's $100,000 was the last funding

and commitment that Century needed to close the Project Loan.

81.     With that assurance, Mr. Cox agreed to invest $100,000 (through the sale of the lot),

and he arranged for $100,000 to be disbursed by the title company handling the lot sale to

Century in exchange for the reconveyance of the trust deed that had previously been given by

CCC Construction to secure a loan from Mr. Schmutz.[29]

82.     On or about May 3, 2010, the title company issued a request for reconveyance of the

trust deed from CCC Construction.[30]

83.     Thereafter, the title company disbursed $100,000 to Century on or about May 25,

2010, and shortly thereafter Mr. Cox executed an Investor's Agreement on behalf of the Coxes,

to reflect his agreement to provide $100,000 as an Investor in the Project Loan.[31]

84.     The Larkins had a duty to advise the Coxes of material information regarding the

Project Loan. The Larkins failed to disclose to the Coxes that Century did not have sufficient

funds in the SunFirst Bank Account to fund the Project Loan. The Larkins failed to honor their

---

[29] Pltf. Ex. 45.

[30] Pltf. Ex. 46.

[31] Pltf. Exs. 47 and 51.

duty and recklessly disregarded the truth by not informing the Coxes that Century only had

$600,000 of the $2.8 million required for the Project Loan. The Larkins knew that Century had

disbursed and spent, for other purposes, over $1.8 million of Project Loan funds, and that

Century had insufficient funds available to permit it to fund the Project Loan. The Larkins'

representation that the $100,000 from the Coxes was the last investment needed for the Project

Loan was false and the Larkins knew the statement was false when it was made.

85.     As agents of Investors and of the Coxes with respect to the Project Loan, Century and

the Larkins owed a fiduciary duty to the Coxes to handle their funds honestly and to disclose to

the Coxes all material information known to Century and the Larkins relating to the Project

Loan. This included a fiduciary duty of the Larkins to disclose to the Coxes that, although

Century had previously received approximately $2.4 million in funds from Investors for the

Project loan, over $1.8 million of those funds had previously been disbursed and spent for other

purposes.

86.     The Larkins representation to the Coxes that Century has collected sufficient funds

for the Project Loan, less $100,000, was material to the agreement to participate in the loan,

inasmuch as the Coxes were willing to participate in the Project Loan only if the Coxes'

investment of $100,000 was the last investment needed to close and fund the Project Loan.

87.     The Coxes did not know that the Larkins recklessly disregarded the truth, and the

Coxes reasonably relied, to their detriment, upon the statements of the Larkins in participating in

the Project Loan and funding the $100,000.

88.     Had the Coxes been told by the Larkins that Century did not have sufficient funds for the Project Loan, the Coxes would not have provided the $100,000 to Century for the Project Loan.

**General Damages Claimed by Telegraph and Christiansen**

89.     Despite reasonable inquiry and efforts to obtain a replacement construction loan, Plaintiffs and the Larkins were unable to do so because construction had commenced on the Project and mechanics' liens had been filed against the Property.

90.     According to Century's representation if Century timely funded the Project Loan construction draw requests on behalf of Investors the Project would have been completed by the nine month anniversary of the Project Loan or approximately January 26, 2011.

91.     According to Century's representations, if Century timely funded the construction draw requests on behalf of Investors the Project would have had a value in excess of the balance owed to Investors.

92.     Specifically, had the Project Loan been funded as agreed, the Project as completed would have had a reasonable fair market value of $3,700,000.00 as of January 26, 2011.[32]

93.     If Century had funded the Project Loan as agreed, the Project Loan balance owed on the trust deed note as of January 26, 2011, would have been $2,775,530.00, taking into account the remaining "interest reserve" component of the Project Loan that would have been credited had the Project Loan been paid off on that date.

---

[32] Plaintiffs argued three methods for valuing the project. *See* Pltf. Ex. 66. The testimony of the Property appraiser, Chad R. Rigby, supported the valuation options the Plaintiffs argued. The Court elects to use the second method, which is the "as-is" valuation of the Project, as the other two methods appear more speculative.

94.     If Century had funded the Project as represented and agreed, the Plaintiffs would have

been required to pay $304,863.84 in additional expenses in order to realize on the value of the

Project.

95.     The land comprising the Project, though still owned by Telegraph, has no value to

Plaintiffs because it is encumbered by mechanics' liens in excess of its fair market value.

96.     Accordingly, the general damages suffered by Plaintiffs as a consequence of the

Larkins' reckless disregard for the truth, as measured by the loss of bargain (the value of the

Project) was $619,606.16 as of January 26, 2011.

97.     Interest should accrue on that sum from January 26, 2011, to the date of entry of

judgment herein, at the legal rate of ten percent (10%) per annum.

98.     Accordingly, general damages claimed by Telegraph and Christiansen are awarded as

follows:

| *Claimed by Telegraph and Christiansen based upon the loss of equity in the Project* | | Total Claimed Loss | Note |
|---|---|---|---|
| Net Value of Project to Telegraph – completed as anticipated | | $3,700,000 | Pltf. Ex. 42, Appraisal of Rigby and Company dated May 31, 2012. |
| Less Project Loan Balance | Loan Balance as of 1/26/2011 Principal amount of loan: $2,821,000 Plus Agreement re "Prepaid" Interest: $39,160 Less Remaining Interest Reserve ($84,630) | ($2,775,530) | Pltf. Ex. 11, Construction Budget-signed. Pltf. Ex. 66, Damage Analysis. |
| Less Additional Required Expenses | Deferred Impact Fees | ($155,591.78) | Pltf. Ex. 12, Impact Deferral Fee |

22

| Claimed by Telegraph and Christiansen based upon the loss of equity in the Project | | Total Claimed Loss | Note |
|---|---|---|---|
| | | | Agreement. |
| | Balance of Builder's Fee | ($49,194.60) | Pltf. Ex. 66, Damage Analysis. |
| | Subcontractor "Hold Backs"     Creative Excavation $17,000     Desert Electric $33,867.46     Larsen Plumbing $10,000     Sure Design Concrete $30,000     B.A. Robinson $9,210 | ($100,077.46) | Pltf. Ex. 66, Damage Analysis. |
| **SUBTOTAL** | | **$619,606.16** | |
| | Interest at 10% per annum from 1/26/2011 as of 5/27/16 | $330,682.96 | |
| **TOTAL GENERAL DAMAGES** | | **$950,289.12** | |

## Telegraph's Special Damages

99.     Telegraph also makes a claim for special damages as a direct and proximate result of the Larkins' reckless disregard for the truth, and because Century failed to timely and completely fund the Project Loan construction draws on behalf of Investors as represented, the Project failed. Among the adverse consequences of the Project failing were the following:

A.     Telegraph halted construction on the Project because, in the absence of the Project Loan funds, Telegraph had no funds to pay the general contractors and subcontractors for work on the Project.

B.     Because the Project could not be completed timely, Telegraph had to move the

wall bracing (which was for construction purposes only) to facilitate the Utah Department of

Transportation's ("UDOT") expansion of Telegraph Road. The cost of moving the wall bracing

was $24,425.00 (comprised of $1,000.00 for engineering and $23,425.00 to B.A. Robinson

Construction for work on the same).

        C.     Telegraph had substantial disputes with Washington City, Utah because

Telegraph could not comply with the Project building permit and breached an Impact Fee

Deferral Agreement, requiring substantial management time and attorney's fees. Ultimately,

Washington City required that the foundations and walls of the partially built structure be

removed. The cost of removing the foundations and walls of the partially built structure was

$25,030.00. The Court value of the management time and attorney's fees incurred in dealing

with disputes with the City in the amount of $13,894.68.

    100.    Telegraph received $42,800.00 from UDOT in connection with a partial

condemnation of a portion of the Property, which should be credited to the damages found by the

Court herein.

    101.    The foregoing special damages Telegraph incurred, in the amount of $20,549.68,

were complete no later than October 4, 2012 when Telegraph entered into the Settlement

Agreement with Washington City. Interest should accrue on that sum from October 4, 2012 to

the date of entry of judgment herein at the legal rate of ten percent (10%) per annum.

24

102.    Accordingly, special damages claimed by Telegraph are awarded as follows:

| Claimed by Telegraph Tower | | Total Loss | Note |
|---|---|---|---|
| | (1) Project Preservation Expenses: | | |
| | Bracing Wall | $24,425.00 | Pltf. Ex. 66, Damages analysis. |
| | Removal of Walls | $25,030.00 | Pltf. Ex. 70, Estimate from Creative Design Excavating for wall demolition.<br>Pltf. Ex. 66, Damages analysis.<br>Pltf. Ex. 71, Settlement Agreement - Washington County and Telegraph. |
| | Less credit for UDOT payment | ($42,800.00) | Pltf. Ex. 66, Damages analysis. |
| | (2) Management time and Attorney fees for Washington City disputes | $13,894.68 | Pltf. Ex. 78, Blackburn & Stoll statement re Washington City issues. |
| SUBTOTAL | | $20,549.68 | |
| | Interest at 10% per annum from 10/4/2012 as of 5/27/16 | $7,493.60 | |
| TOTAL SPECIAL DAMAGES | | $28,043.28 | |

**Telegraph and Christiansen's Special Damages Claimed Resulting from the State Court Litigation**

103.    Plaintiffs claim that as a direct and proximate result of the Larkins' conduct, and because Century failed to timely and completely fund the Project Loan on behalf of Investors, in accordance with the representations made, litigation ensued in the State Court (the "Litigation"), involving Plaintiffs, Harrell, Century, Donald Larkin, Stephen Larkin, Brian Larkin, various parties claiming mechanics' liens on the Property, and Investors that had agreed to make the loan through Century.

104.    The Larkins' bankruptcy filings stayed the Litigation against the Larkins, Brian

Larkin and Century. The Bankruptcy Court dismissed the chapter 7 petitions filed by Brian

Larkin and Century, but the Litigation has not yet been concluded.

105.    Plaintiffs did not prevail on certain actions in the Litigation and judgments were

entered in favor of certain Investors, and against Plaintiffs, jointly and severally, for costs and

attorney fees incurred in the Litigation ("Attorney's Fees Judgments"), as follows:

A.      To "VF Parties": $193,738.26, with interest after January 23, 2014, at the

statutory judgment rate of 2.13%;

B.      To Barbara and Lyle Stringham: $55,053.00, with interest after December 17,

2013, at the statutory judgment rate of 2.16%.

106.    Plaintiffs did not present sufficient evidence to support the contention that the Larkins

should indemnify Plaintiffs or otherwise be responsible for attorney fees awarded to certain

Investors in the Litigation. Plaintiffs initiated the Litigation and did not prevail. Plaintiffs are not

entitled to a judgment against the Larkins for the amounts of the Attorney's Fees Judgments and

the Larkins are not required to indemnify Plaintiffs with respect thereto.

107.    Accordingly, Telegraph and Christiansen's claim for special damages stemming from

the State Court Litigation are awarded as follows:

| Claimed by Telegraph Tower and Christiansen | | Total Loss | Note |
|---|---|---|---|
| | Indemnity for Amounts owed to Investors: | | |
| | To "VF Parties" for attorney fees | ($193,738.26, plus interest after 1/23/14 at Utah judgment rate of 2.13%) | Pltf. Ex. 77, Judgement and Rule 54(B) Certification in State Court. |
| | To Barbara and Lyle Stringham for attorney fees | ($55,053, plus interest after | Pltf. Ex. 77, Judgement and |

| *Claimed by Telegraph Tower and Christiansen* | | Total Loss | Note |
|---|---|---|---|
| | | *12/17/2013 at Utah judgment rate of 2.16% )* | Rule 54(B) Certification in State Court. |
| | Indemnity for further amounts Telegraph and Christiansen may be required to pay Investors in connect with the Project Loan and/or further attorney fees and costs. | | Pltf. Ex. 77, Judgement and Rule 54(B) Certification in State Court. |
| **SUBTOTAL** | | *$248,791.26* | |
| **TOTAL SPECIAL DAMAGES** | | **NONE** | |

**Telegraph's Claim for Special Damages as a Result of Mechanics Liens**

108.    Telegraph was unable to pay charges and costs previously incurred in construction of the Project, which resulted, in part, in the filing of numerous mechanics' liens against the Property, and substantial increases in such costs (with interest and attorney's fees).

109.    The Litigation against the mechanic's lien claimants fixed Telegraph's liability to the mechanic's lien claimants, which are secured by the mechanics' liens against the Property, as follows:

A.    B. A. Robinson & Sons Const., Inc., holds a mechanics' lien against the Property to secure a judgment in the sum of $123,340.44, plus interest from and after January 13, 2014, at the rate of 4.13% per annum.

B.    Sure Design Concrete, Inc., holds a mechanics' lien against the Property to secure a judgment in the sum of $97,099.38, plus interest from and after March 22, 2014, at the per diem rate of $7.22.

C.    Creative Excavating, Inc., holds a mechanics' lien against the Property to

secure a judgment in the sum of $82,411.51, plus interest from and after March 21, 2014, at the per diem rate of $6.09.

110.    Amounts owed to the foregoing mechanics liens claimants were included in the Project Loan balance as a projected expense.[33] Thus, the base amounts of the mechanics liens are accounted for in the general damages claimed by Telegraph. The substantial increases due to interest and fees were not included in the Project Loan balance as a projected expense.

111.    Telegraph's special damages as a consequence of the mechanic liens, less the projected amounts for supplies and work performed by mechanics liens claimants, are $90,307.39, plus interest at the aforementioned legal rates.

112.    Accordingly, Telegraph's special damages resulting from the mechanics liens are awarded as follows:

| *Claimed by Telegraph Tower* | | Total Loss | Note |
|---|---|---|---|
| | Amounts owed to Mechanics' lien claimants, which are secured mechanics liens against the Property: | | |
| | B. A. Robinson & Sons Const., Inc. | $123,340.44 plus interest from and after January 13, 2014, at the rate of 4.13% per annum | Pltf. Ex. 66, Damages analysis. Base estimated cost of $102,700.00. |
| | Sure Design Concrete, Inc. | $97,099.38, plus interest from and after March 22, 2014, at the per diem rate of $7.22 | Pltf. Ex. 18, Construction Draw No. 3. Base cost of $58,726.34. |
| | Creative Excavating, Inc. | $82,411.51, plus interest from and after March 21, 2014, at the per diem rate of $6.09 | Pltf. Ex. 18, Construction Draw No. 3. Base cost of $51,117.60. |

---

[33] *See* Pltf. Ex. 18.

| Claimed by Telegraph Tower | | Total Loss | Note |
|---|---|---|---|
| | Less amounts included in Project Loan balance:<br>    B. A. Robinson & Sons Const., Inc. estimated at $102,700.00<br>    Sure Design Concrete, Inc. $58,726.34<br>    Creative Excavating, Inc. $51,117.60 | ($212,543.94) | Pltf. Ex. 18, Construction Draw No. 3.<br>Pltf. Ex. 66, Damages analysis. |
| **SUBTOTAL** | | **$90,307.39** | |
| | Interest as of 5/27/16 | $22,686.15 | |
| **TOTAL SPECIAL DAMAGES** | | **$112,993.54** | |

**Christiansen's Claim for Special Damages:**

113.    Christiansen claims that if the Project Loan had been funded Christiansen would have received fees for supervising the Project in accordance with the Project Loan construction budget.

114.    The Court finds that, based upon the evidence presented, the anticipated supervising fee was included in the total amount of the Project Loan and thus is not awardable as separate special damages.

115.    Christiansen was (and is) a licensed real estate agent, and Christiansen anticipated that he would also be the marketing agent for the Project and receive fees from the same if the Project were developed as a condominium building. The Court is using the "as-is" valuation of the Project for Telegraph's general damages, *supra*, because the development of the Project as a condominium was and is speculative. Accordingly, Christiansen's losses for marketing fees, if the Project was developed as a condominium, are also speculative and not awardable.

116.    Christiansen claims that he suffered emotional and mental distress as a result of the

Larkins conduct. Based on the evidence presented, the Court finds that Christiansen did not meet

his burden to prove he suffered emotional and mental distress as a result of the Larkins' conduct.

Further, there was no corroboration from any expert that Christiansen incurred such damages.

117.    Accordingly, special damages claimed by Jared Christiansen are awarded as follows:

| *Claimed by Jared Christiansen* | | **Total Loss** | **Note** |
|---|---|---|---|
| | Supervision Fees | *$86,250.00* | Pltf. Ex. 11, Construction Budget-signed.<br>Pltf. Ex. 66, Damages analysis. |
| | Marketing Income | *$193,000.00* | . |
| | Mental anguish, pain and suffering | $ | |
| **SUBTOTAL** | | ***$279,250.00*** | |
| **TOTAL SPECIAL DAMAGES** | | **NONE** | |

### Damages to the Coxes, Assigned to Plaintiffs:

118.    As a direct and proximate result of the Larkins' reckless disregard for the truth and

breach of their fiduciary duty to the Coxes, the Coxes suffered damages of $100,000.00 (the

amount provided to Century for use in funding the Project Loan).

119.    The Coxes received two interest payments of $1,000 from Century, on or about June

28, 2010 and July 26, 2010.

120.    Christiansen, as assignee of the Coxes, is entitled to recover the sum of $100,000,

plus interest at the legal rate of 10% per annum from July 26, 2010 to the date of entry of

judgment herein.

121.    Accordingly, general damages claimed Jared Christiansen, as assignee for the Coxes, are awarded as follows:

| Claimed by Jared Christiansen, as assignee | | Total Loss | Note |
| --- | --- | --- | --- |
| | Principal Amount of participation in loan | $100,000.00 | Pltf. Ex. 51, Investor Agreement signed Cox. |
| **SUBTOTAL** | | **$100,000.00** | |
| | Interest from 7/26/2010 at 10% per annum as of 5/27/16 | $58,410.96 | |
| **TOTAL GENERAL DAMAGES** | | **$158,410.96** | |

## III.    CONCLUSIONS OF LAW

A.  *Legal Standard Under Section 523(a)(2)(A)*

Section 11 U.S.C. § 523(a)(2)(A)[34] states as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
...
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

Exceptions to discharge are narrowly construed and any doubt is to be resolved in the debtor's favor.[35] To except a debt from discharge under § 523(a)(2)(A), a "creditor must prove the following elements by a preponderance of the evidence: [1] [t]he debtor made a false

---

[34] All subsequent statutory references are to Title 11 of the United States Code unless otherwise indicated.

[35] *See DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (10th Cir. B.A.P. 2012) (citation omitted).

representation; [2] the debtor made the representation with the intent to deceive the creditor; [3]

the creditor relied on the representation; [4] the creditor's reliance was [justifiable]; and [5] the

debtor's representation caused the creditor to sustain a loss."[36]

The Larkins do not dispute that Plaintiffs relied on their representation and that such

reliance was justifiable, which caused Plaintiffs to sustain a loss. The only questions remaining

are whether the Larkins made a false representation, whether the Larkins made such

representations with the intent to deceive Plaintiffs, and the total amount of loss suffered by

Plaintiff as a result of the representation.

### i. *False Representation*

Plaintiffs assert that the Larkins' made a false representation when the Larkins failed to

disclose to Plaintiffs that Century used the majority of the funds collected from Investors for the

Project Loan. Plaintiffs state that the Larkins informed the Coxes that Century only needed an

additional $100,000 to close the approximately $2.8 million Project Loan, when in fact Century

only had approximately $600,000 in the SunFirst Bank Account to close the Project Loan.

Plaintiffs and the Coxes assert that the Larkins represented that Century had collected sufficient

funds from Investors in order to proceed with and close the Project Loan when in fact Century

did not have sufficient funds.

The Larkins concede that they made representations to Plaintiffs and Coxes, on behalf of

Century and Investors, that sufficient funds had been collected to close and fund the Project

Loan.  The Larkins allege that the representations were not false, at the time made, but rather true

---

[36] *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996) (citation
omitted); *see also Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 and n.3 (10th Cir.
2009) ("the Supreme Court later clarified [in *Field v. Mans*] that the proper standard is
'justifiable reliance' rather than 'reasonable reliance.'") (quoting *Field v. Mans*, 516 U.S. 59, 116
S. Ct. 437, 133 L. Ed. 2d 351 (1995)).

because the Project Loan funds were being held in various forms, other than readily available

cash, such as Future Receivables and anticipated collections. The Larkins argue that per their

business model, which proved successful for over 20 years, they never disclosed to investors

and/or borrowers the amount of funds in the SunFirst Bank Account and in this case the Larkins

saw no need to deviate from their norm. The Larkins acknowledge that Century was unable to

fund the Project Loan and construction draws on the Project Loan but the Larkins had good faith

hopes that funds would be available for the Project Loan.

The Larkins' representation to Plaintiffs that Century had collected sufficient funds to

proceed with and close the Project Loan were false. The Larkins' representation to Coxes that

Century only needed $100,000 to complete funding for the Project Loan was false. Contrary to

the representations made by the Larkins, Century was unable to fund the Project Loan

construction draws as they came because Century did not have readily-available cash to fund the

Project Loan and needed much more than $100,000 for the Project Loan to close. Accordingly,

Plaintiffs and Coxes have met their burden of showing that the representations made by the

Larkins were false.

### ii.   Intent to Deceive

As recognized by the Tenth Circuit Bankruptcy Appellate Panel in *Columbia State Bank,*

*N.A. v. Daviscourt*,[37] which the Court finds persuasive, an intent to deceive or "scienter" under §

523(a)(2)(A), may be inferred from the totality of the circumstances including reckless disregard

of the truth.[38] The Court may consider the debtor's conduct at the time of the representations and

---

[37] *Columbia State Bank, N.A. v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 685 (10th
Cir. B.A.P 2006).

[38] *Cobra Well Testers, LLC v. Carlson (In re Carlson)*, No. 06-8158, 2008 WL 8677441,
at *2 (10th Cir. Jan. 23, 2008); *see also In re Johnson*, 477 B.R. at 169 ("[m]aking a

subsequent conduct to the extent it provides an indication of the debtor's state of mind at the time

of the representations.[39] Thus, a subjective reckless disregard for the truth of a representation

may constitute fraud.[40] However, "reckless disregard" should be very narrowly interpreted.[41]

In this case, the Larkins' intent to deceive can be inferred from their reckless disregard

for the truth concerning Century's funds available for the Project Loan. The Larkins argue that

their business practice of not disclosing the amount of funds on hand to investors and/or

borrowers worked for over 20 years; thus, with the Project Loan the Larkins did not see a reason

to depart from their normal practice. The Larkins knew that Century did not have sufficient funds

for the Project Loan but irresponsibly ignored this material fact by failing to disclose the fact to

Plaintiffs and the Coxes. Applying the narrow interpretation of "reckless disregard" from *In re*

*Kukuk*, the Court concludes that Plaintiffs and the Coxes have shown, by a preponderance of

evidence, that the Larkins had the requisite intent to deceive Plaintiffs and the Coxes.

---

representation to a creditor with a 'reckless disregard for the truth' may be evidence of an intent
to deceive the creditor") (quoting *First Nat'l Bank v. Cribbs (In re Cribbs),* 327 B.R. 668, 673-
74 (10th Cir. B.A.P. 2005), *aff'd*, No. 05-6225, 2006 WL 1875366 (10th Cir. July 7, 2006)).

[39] *In re Johnson*, 477 B.R. at 169 (citations omitted).

[40] The Restatement of Torts makes clear that "a misrepresentation is fraudulent if the
maker knows or believes that the matter is not as he represents it to be." Restatement (Second)
Torts § 526 (1977); *see also Lang v. Lang (In re Lang)*, 293 B.R. 501, 513 (10th Cir. B.A.P.
2003) ("Under Utah law, fraudulent misrepresentation is established when a party demonstrates
that the other party made 'a false representation concerning a presently existing material fact
which the representor either knew to be false or made recklessly without sufficient knowledge,
or the omission of a material fact when there is a duty to disclose, for the purpose of inducing
action on the part of the other party, with actual, justifiable reliance resulting in damage to that
party'") (citation omitted).

[41] *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 787 (10th Cir. B.A.P.
1998).

34

### iii.  Justifiable Reliance

Again, the Larkins do not dispute that Plaintiffs and the Coxes relied on their representation and that such reliance was justified. Although Plaintiffs and the Larkins were in a relationship for over a year, which may have given Plaintiffs time to uncover certain facts about the funds for the Project Loan, Plaintiffs' reliance on the Larkins' representations was justified based on the particular circumstances of this case. Century and the Larkins had a good reputation in the community and on several occasions supplied Plaintiffs with information to assure Plaintiffs that Century had the Project Loan funds parked and ready to disburse when needed. Similarly, the Coxes were constantly assured by the Larkins that Century only needed $100,000 to complete funding for the Project Loan. Accordingly, the Court concludes Plaintiffs' and the Coxes' reliance on the Larkins' representations was justifiable.

### iv.  Damages

Under § 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that "the amount of his damages [are] attributable to *actual* fraud,"[42] and "'[b]ut for' causation alone is not enough."[43] Plaintiffs seek general and special damages. The Court determines that an award of $619,606.16 for general damages, $20,549.68 for special damages for Telegraph only, $90,307.39 for special damages for Telegraph only resulting from mechanics' liens on the

---

[42] *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 692 (10th Cir. B.A.P. 2013) (emphasis in original).

[43] *Phoenix Equity Ventures, LLC v. Baillio (In re Baillio)*, No. 08-1124, 2010 WL 3782065, at *21 (Bankr. D.N.M. Sept. 21, 2010).

Property, plus interest until entry of judgment, is appropriate under §523(a)(2)(A) as the

Plaintiffs have met their required burden.

Section 523(a)(2)(A) prevents the discharge of any debt respecting money, property,

services, or credit that the debtor has "fraudulently obtained, including treble damages,

attorney's fees, and other relief that may exceed the value obtained by the debtor."[44]

Accordingly, Plaintiffs will be awarded a non-dischargeable judgment in the aforementioned

amounts as stated previously.

Plaintiffs also seeks special damages for all amounts for which they are liable to third

parties under the "Attorney's Fees Judgments" issued in the Litigation and special damages for

Christiansen for lost supervision fees, anticipated marketing income, and emotional and mental

anguish. The Court concludes that, based upon the evidence presented, Plaintiffs failed to meet

their burden to prove that these damages are recoverable.

B.  *Legal Standard Under Section 523(a)(4)*

Section 523(a)(4) states as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor

from any debt . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or

larceny[.].

The fiduciary defalcation exception in § 523(a)(4) has been particularly defined by the

Tenth Circuit.[45] To prevail on a § 523(a)(4) claim, a creditor must establish three elements: (1)

---

[44] *Cohen v. de la Cruz*, 523 U.S. 213, 223, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998).

[45]  *In re Young*, 91 F.3d at 1371.

the debt resulted from a fiduciary's fraud or defalcation under an express or technical trust

involving the entrusting of money or other property to a fiduciary for the benefit of another; (2)

the debtor acted in a fiduciary capacity with respect to the trust; and (3) the transaction in

question was a "defalcation" within the meaning of bankruptcy law.[46] The creditor has the

burden of persuasion, which must be met by a preponderance of the evidence.[47]

The Larkins do not dispute and the Court concludes that they acted as fiduciaries to the

Coxes, as an Investor, with respect to the Project Loan. The Construction Loan Agreement and

Investor Agreement made clear that Century was to act as agent for Investors with respect to the

Project Loan. The Larkins concede that the Coxes entrusted Century with $100,000 per the

Investor Agreement for the benefit of the Project Loan to Plaintiffs. The Larkins acknowledge

that the representations made to the Coxes with respect to the Project Loan, while in a fiduciary

capacity, and the Court concludes, *supra*, those representations were false. The only questions

remaining are whether the Larkins acted as fiduciaries to Telegraph and Christiansen and

whether the transaction with the Coxes was a defalcation.

Plaintiffs argue they were "intended beneficiaries" of the fiduciary relationship between

Century and Investors. The Tenth Circuit has stated that a creditor must prove that an express or

technical trust existed with respect to the parties prior to the creation of the debt.[48] Here,

Plaintiffs acknowledge that per the Construction Loan Agreement, Century acted as agent to

Investors and not Plaintiffs. Plaintiffs did not present sufficient evidence to substantiate the

---

[46] *Id.*

[47] *Grogan v. Garner,* 498 U.S. 279, 290-91, 111 S. Ct. 654, 661, 112 L. Ed. 2d 755
(1991).

[48] *In re Young*, 91 F.3d at 1371.

37

argument that their intention to benefit from the agency relationship between Investors and

Century created a fiduciary relationship between Plaintiffs and Century. Accordingly, the Court

concludes that a fiduciary relationship did not exist between Plaintiffs (Telegraph and

Christiansen) and the Larkins.

The remaining question is whether the debt arose from misconduct that is a "defalcation"

within the meaning of bankruptcy law. In order to hold a debt non-dischargeable under §

523(a)(4), the debtor must have "acted with wrongful intent, or, at a minimum, with a conscious

disregard of his or her fiduciary duties."[49] A creditor must show that "the debtor disregarded a

harm of which he was aware," meaning "the debtor must have been subjectively aware he had a

fiduciary duty and his actions risked breaching such a duty or that he was willfully blind[.]"[50]

The Larkins owed a fiduciary duty to the Coxes but nonetheless recklessly disregarded the truth

to induce the Coxes to invest $100,000 in the Project. Further, the Larkins falsely represented to

the Coxes that their $100,000 would be the last investment needed to fund the Project.  Finally,

the $100,000 from the Coxes was not used as the Larkins represented because the Larkins used

the money for purposes other than to fund the Project Loan. Accordingly, the Court concludes

the Larkins breached their fiduciary duty to the Coxes with the requisite capable intent required

by § 523(a)(4).

IV.    **CONCLUSION**

For the reasons stated above, and based on the entire record, the Court concludes that

Plaintiffs have established the elements of § 523(a)(2)(A) but did not establish the elements of §

---

[49] *Jantz v. Karch (In re Karch),* 499 B.R. 903, 906 (10th Cir. BAP 2013) (citing *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013)).

[50] *Caitlin Energy, Inc. v. Rachel (In re Rachel),* 527 B.R. 529, 543 (Bankr. N.D. Ga.2015).

523(a)(4). The Coxes established the elements of §§ 523(a)(2)(A) and 523(a)(4). For these reasons, the Court determines that the debt owed to Plaintiffs and the Coxes is nondischargable under § 523(a)(2(A) in the amounts as stated herein. Further, the obligation to the Coxes only, in the amount of $100,000 plus accruing interest is determined to be non-dischargeable pursuant to § 523(a)(4).

An order and judgment in accordance with these Findings of Fact and Conclusions of Law shall be uploaded by counsel for Plaintiffs.

_____END OF DOCUMENT_____

## <u>DESIGNATION OF PARTIES TO RECEIVE NOTICE</u>

Service of the foregoing **FINDINGS OF FACT AND CONCLUSIONS OF LAW** shall be served to the parties and in the manner designated below:

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users.

- Matthew D. Ekins     matt@utahcase.com
- Bryce D. Panzer     bpanzer@blackburn-stoll.com

**Manual Notice List:** The following is the list of parties who are not on the list to receive email notice/service for this case (who therefore require manual noticing/service). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

Donald Joseph Larkin

575 East 700 South

Saint George, UT 84770

Stephen Max Larkin

627 East 160 South

Saint George, UT 84770

**All parties on the Court's official case MATRIX.**